22-2041. It is still morning, Mr. Samaroo. Good morning. Thank you all, your honors, for allowing me this opportunity as a pro se litigant. I take this opportunity to review the case. Basically, this is a SOX whistleblower case. And basically, in terms of SOX, I'm trying to make sure that I have provided all the evidence, witnesses, and everything that I have compiled and gathered as when I was in the Bank of New York Mellon. And during this time, I made sure as a SOX whistleblower that I made sure that the fraud that was being committed by the bank was reported to everybody internally inside the organization in terms of retaliation, in terms of discriminatory conduct that was conducted by employees or senior managers in the bank, and also whistleblower that the bank had employees wanted me to do unlawful conduct, and I refused to do that. And in terms of the timelines, everything I've tried to document throughout the case in the details. So my timeline is there, very detailed, providing the facts. And what I've done is to make sure when I became the chief administrative officer in the bank, my predecessor, Yvonne Buffo, told me that Dave Moran was a racist. He was a tall, white man reporting to Emil Menzies, a black man, a short black man. Based on that incident and this type of information, I started to collect information and make sure that I gathered all the details. And I tried to gather all information. And when the time came, the organization went through changes, again, all documented in my timeline. I wanted to make sure that this information was provided internally in terms of the company. Then the organization went through organization changes. It's a bank. It has its own rules and regulations. And it was being monitored by regulatory, including specifically the Federal Reserve Bank of New York, the Office of the Comptroller of the Comptroller, the OCC, and also the Financial Crime Network. All of these regulatory agencies and entities, as I went through the process, first trying to do it internally inside the bank, then after I was fired, then I had to go through, follow the process of filing complaints. And when I was inside the bank, one of the things that happened was because of 9-11, there were challenges within the organization in terms of the Bank of New York. During this time, there were a lot of the physical building of 101 Barclay was affected. The atrium, all the windows were blown out. I remember that. Yes, and the thing is, I was not there. But because there was some incident going on in the building, I started to ask questions. I talked to my managers, their senior managers, managing directors. The principal problem we have to face is that the court below found that your complaint about nepotism is not protected under the Sabrean-Hoxley. And that, you know, you did everything exactly right, but that question is one which is binding. I mean, if that is the law, that it is not covered under Sabrean-Hoxley. Your Honor, I respectfully disagree. This is not about nepotism. It is about the fraud that is being conducted. And it's a cover-up of the timeline that I tried to explain through the documents that the defendant tried to establish that it was nepotism. It was not nepotism. What was going on was gaslighting. And the way that it was done, it was using- When you say one term, when you say gaslighting- Yes, gaslighting is a psychological manipulation and emotional abuse that goes on. And it's not done by one person. It's a group of people who are doing this. I'm very sympathetic. Just to pick up on what my colleague just said, the Sabrean-Hoxley whistleblower anti-retaliation provision really protects a very narrow set of conduct. And it's mostly related to bank-related fraud and security fraud, as I would call it. And there may be another category, sir, of complaints that are protected. So, for example, employment, race-related issues, maybe even nepotism. I don't know. But 806 is a very specific set of protective measures. Yes, and one of those measures is the identity of fraud against shareholders. And the fraud that was being conducted was to hide the things that was going on inside the bank. They misrepresented what was going on. They were telling the shareholders, the customers, everybody that things were happening. But in the reality, internally, that was not the case. And that's what I tried to document. And we've got the documents. We've got the record. Why don't we then hear from the bank? Thank you. May it please the Court, John Leaf on behalf of the appellee, Bank of New York Mellon. The district court here held that Mr. Sandler failed to state a claim for relief under Section 806 of SOX. And they made two primary holdings. One, as your honors have already pointed out, that complaints about alleged nepotism are not protected by Section 806 of SOX. He's saying that there's a broader complaint that operates as a fraud on the shareholders because it's not disclosed to the shareholder that actually our business is nepotistic. And, therefore, presumably less efficient. We understand. And the district court, the magistrate judge, reviewed all of Mr. Sandler's internal complaints. He attached them to his opposition to the bank's motion to dismiss. And after carefully considering the entire record the magistrate held, they all appeared to relate to nepotism. And to the extent he's not— Well, well, but it doesn't matter if they related to nepotism if the nepotism was the source of the fraud. If it was very—if my company says we hire no one who is related and it turns out that everybody is a cousin, second cousin, third cousin, that might be fraud. So your argument has to be a different one. It has to be that the fraud claim, which has to be made under Section 9 and so on more specifically, was not here made. But you can't simply say that because of a fraud that's based on nepotism, we ignore it. Well, Your Honor, I think there's two points in response to that. One is that I don't believe that complaints about nepotism can constitute shareholder fraud unless there's some very specific factual allegation present. Sure, sure. I'm sorry. It was not put here. So they—unless there's a very specific allegation. So 15 years ago, maybe 20 years ago, there were a set of so-called fraudulent schemes involving banks that were hiring interns who happened to be the sons and daughters and relatives of very powerful foreign dignitaries without disclosing that they were doing that and that that was a way to, in effect, bribe foreign officials. Would that be protected if there was a complaint about that? I think that's— That's a form of nepotism, broadly speaking. I believe that that could be protected if that was factual. And I'm not trying to suggest that as a matter of law, a complaint about nepotism can never be protected. You're saying here. Based on the facts here and what Mr. Samaru raised in all of his internal complaints, the magistrate judge reviewed all of those. The court below reviewed hundreds of pages of those and found if your complaint was not about nepotism or favoritism in hiring, make that clear. I give you an opportunity to amend the complaint. Here's the phone number for the pro bono legal clinic at the New York Lawyers Assistance. Please contact them. The district court also gave Mr. Samaru additional time to amend the complaint. Both of the dismissals were without prejudice. He never took those opportunities. And I understand he's proceeding pro se, and I have sympathy for his predicament. I understand that. But at no point has he ever alleged that the complaints with any specificity—excuse me—related to some fraud on shareholders, that there was some representation made about the hiring practices that was inconsistent with the conduct about which he complained. There's no such factual allegation present here. And that's why his conduct cannot be protected by Sarbanes-Oxley. Thank you very much. Thank you, Your Honor. So, Mr. Samaru, we're going to reserve decision. I'm sorry, but I had like two minutes. Did you? Okay, so, all right. Thank you, sir. Yes, I did say in my complaints that there is the idea in 2016, the vendor management assistance scenario, they wanted me to approve something that was illegal. I could not see contracts, and they were trying to tell everybody with OCC that they were changing their processes and doing other stuff about vendor management. They were reporting that there were no problems with the vendors and their third-party relationships, yet the reality is that they wanted me to do something illegal. They wanted me to rubber stamp approvals, but I said no. And I reported that to the person, his manager, and to Emil Menzies, who was now taking responsibility of that. And this became the problem that escalated the situation. And when I was given the file, a file that was 1,100 pages that contained information that was confidential supervisory information that I learned about, then they tried to cover up through that suspicious activity reporting to the financial crime network that I later on had to go and tell them that they're hiding this file. Tell who? I reported it to the financial crime network entity. FinCEN, okay. Yes, because they were trying to cover up when this file was given out of the network. As a standard operating procedure, I, in my role and responsibility, would always be taking stuff outside the network. And the bank never complained to me, never gave me a warning. But the problem was this file and the amount of information on this file, 1,100 pages of the organization about the vendors, all the things. This document belongs, to my understanding, to the Federal Reserve Board of New York. It's not a property of the bank. And the bank never told me any of this. I had to do my own due diligence contacting the agencies to figure this out. And as part of this timeline, they were hiding everything. Thank you. Thank you very much. Sir, what I was about to say, I apologize, is that we're going to reserve a decision, as you've heard me say, with respect to all these cases. And you'll get a decision at some point. But we thank you for your time. Thank you for your time. That also concludes today's argument calendar. And I'll ask the Courtroom Deputy Director in Court. Thank you. Thank you. Thank you. Court is adjourned.